### KELLY v. HERRMAN et al.

(Circuit Court, S. D. Ohio, W. D. February, 1906.)

CONTRACTS—IMPLIED CONDITIONS—CONTRACT WITH BASEBALL PLAYER.

The provisions of the "national agreement for the government of professional baseball," adopted by the so-called "major" and "minor" leagues in 1903, and of the rules of the national commission created thereby, which give to a club having a player under contract with it the right to reserve such player for the ensuing season or to sell him to another club, in the absence of a stipulation to the contrary in the contract, are not binding upon a player who continued during succeeding years to play with a club under a contract entered into prior to the adoption of such agreement or the promulgation of the rules, and who did not thereafter make any new contract under or with reference to the same, and such club has no power to sell him without his consent, nor has the commission the right to enforce the prescribed penalties because of his refusal to recognize such a sale.

In Equity. On motion for preliminary injunction.

F. L. Hoffman, for plaintiff.

J. E. Bruce, C. J. McDiarmid, and Ernst Rehm, for defendants.

THOMPSON, District Judge. Three great organizations, viz., the National League, the American League, and the National Association, include in their membership "practically every professional baseball club in the United States." The first two are known as the "major" leagues and the last as the "minor" league. These organizations on September 11, 1903, formed a combination under what is known as the "national agreement for the government of professional baseball." Article 1 of this agreement provides that:

"This agreement shall be indissoluble except by the unanimous vote of the parties to it, and if any of said parties withdraws from it, or violates any of its fundamental principles, the party so withdrawing or offending shall be treated as the enemy of organized baseball."

Article 3 provides that:

"On or before March first of each year a committee of three from each of the major leagues to this agreement—the National and the American League —shall meet and adopt a code of rules to regulate the playing of the game of baseball for the ensuing season, a majority vote being required to adopt, revise or repeal a rule."

Article 4, § 1, provides that:

"A commission of three members, to be known as the national commission, is hereby created with power to construe and carry out the terms and provisions of this agreement, excepting when it pertains to the internal affairs of the National Association. One member shall be the president of the National League and one the president of the American League. These two members shall meet, on or before the first Monday of January in each year, to elect by a majority vote a suitable person as a third member. The third member so chosen shall be the chairman of the commission for one year from the date of his election, and shall preside at all meetings. Each member shall have a vote on all questions which may come before it, except as hereinafter directed."

Section 3 provides that:

"The nat'cnal commission shall have the power to inflict and enforce fines or suspensions, or both, upon either party to this agreement who are adjudged by it to have violated the letter or spirit of this agreement."

Section 4 provides that:

"Whenever a National League club or an American League club claims the services of the same player by selection, reservation or contract, the right to said player shall be established by the decision of the chairman of the commission, who shall determine the case on the law and evidence without the aid of either of his associates."

Article 6, § 1, provides that:

"All parties to this instrument, pledge themselves to recognize the right of reservation, and respect contracts between players and clubs under its protection."

Section 2 provides that:

"Any club or league which harbors a player who refuses to observe his contract with a club member of any party to this agreement, or to abide its reservation, shall be considered an outlaw organization and its claims to contractual and territorial rights ignored."

Section 3 provides that:

"The right and title of a major league club to its players shall be absolute, and can only be terminated by release or failure to reserve under the terms of this agreement by the club to which a player has been under contract. When a major league club serves notice of release on one of its players, he shall be ineligible to contract with a club or another league, if, during ten days after the service of such notice of release, a club in the league in which he has been playing shall demand his services."

Section 8 provides that:

"A major league club may, at any time, purchase the release of a player from a minor league club, to take effect forthwith, or on a specified date, provided such purchase is recorded with the secretary of the commission and secretary of the National Association for promulgation within five days of the date of the transaction."

Article 7 provides that:

"On or before the twenty-fifth day of September in each year the secretary of each party to this agreement shall transmit to the secretary of the commission a list of players then under contract with each of its several club members for the current season, and in addition thereto a list of such players reserved in any prior annual reserve list who have refused to contract with such clubs. Such players, together with all others thereafter to be regularly contracted with by such clubs (namely, those whose releases have been secured for future services by purchase or selection by draft under this agreement), are and shall be ineligible to contract with any other club of any league during the period of time between the termination of their contracts and the beginning of the next season. The secretary of the commission shall thereupon promulgate such lists. No club shall be permitted to reserve any player while in arrears of salary to him. Failure of a club to tender a contract to a player by March first shall operate as a release."

Article 8, § 1, provides that:

"All contracts between clubs and players in the major league shall be in a form prescribed by the national commission."

Section 2 provides that:

"Any agreement between club and player for service, evidenced by written acceptance, whether by letter or telegram, or receipt from player for money advanced to him to bind such agreement, shall be construed to be a contract and held to be binding, provided the player declines to enter into a formal contract; but his refusal to sign such formal contract shall render him ineligible to play with the contracting club for more than a period of ten days, or to enter the service of a club of any party to this agreement unless released."

Rule 24 of the "Rules and Regulations Governing the National Commission" provides that:

"On or before the thirty-first day of August of each year each club of the National and American Leagues shall furnish the secretary of the national commission with a list of all players purchased by them; and any claim that a player has been purchased previous to August thirty-first of any year shall not be considered by the commission, unless the name of such player appears upon such list."

Rule 26 provides that:

"All major league clubs in submitting lists of purchased players as required by rule 24, of the national commission, shall also be required to file with the commission copies of the agreement entered into relating to such purchases; it being the intent and desire of the commission to make close inquiry into all agreements providing for purchases, in order that all transactions may be

bona fide, and not made with a view of protecting clubs in retaining players, thereby preventing the players from developing in their profession, and enabling them to secure adequate compensation for their expertness, as is provided by the national agreement."

Rule 27, par. "a," provides that:

"Where the contract contains a reservation clause, the player shall in no instance be held to be free from reservation unless the clause is stricken from the contract."

Paragraph "b" provides that:

"Where the contract does not contain a reservation clause, every club, nevertheless, has a right to reserve a player, unless the contract itself contains a written stipulation that the player is not to be reserved."

Paragraph "e" provides that:

"In order that the attention of players may be called to this rule, the secretary of the commission will be required to advertise the same in at least two papers devoted to sport, no less than twice each year."

Article 4, § 4, mentions three methods by which the service of players may be obtained or continued, viz., selection, reservation, and contract; but it is only necessary here to consider the control of the services of a player by reservation.

A player under contract to serve may be reserved for the ensuing year, "unless the contract itself contains a written stipulation that the player is not to be reserved." See rule 27b. That is, he must serve the club for the ensuing year unless he is sold to some other club, or unless—to use another form of expression in baseball parlance—some other club buys his release. The players are not parties to the "national agreement for the government of professional baseball," but the claim of the defendants is that the players know of the usage of reservation, and therefore must be deemed to have contracted with reference to it.

The affidavits show that in the fall of 1901, nearly two years before the national agreement was entered into, Kelly entered into a written contract with the St. Paul Baseball Club to serve as its playing manager and first baseman, and continued to serve as such until November 19, 1904, when he was further and additionally employed to act as president and general manager of the club, and thereafter was paid a salary commensurate with the services required of him, "and during the season of 1905 received from the St. Paul Baseball Club a sum of money which was larger than any sum ever paid to a playing manager of any minor baseball club," to the knowledge of Lennon, the owner of the St. Paul Baseball Club (see Lennon's affidavit); that, as the reputed president of the St. Paul Baseball Club, he was on January 19, 1905, elected a member and chairman of the board of directors of the American Association of Baseball Clubs; that he never signed the player's contract required by the national agreement, or any contract other than the special contract entered into with the said St. Paul Baseball Club in the fall of 1901, his employment as acting president and general manager not having been the subject of a written contract; that as manager he forwarded, at the end of each season, a list of players in reserve by the St. Paul Baseball Club, but did not at any time include his own name in the list; that, in addition to the performance of his

duties as acting president and general manager, he played as first baseman during the season of 1905; that early in the season of 1905 there was "personal disagreement" between Lennon and Kelly, and on August 16, 1905, the St. Paul Baseball Club, owned and controlled by Lennon, sold Kelly to the St. Louis American League Club. Kelly complains that, when he was sold to the St. Louis club, he was not under contract to the St. Paul Baseball Club as a player, within the meaning of the reservation provisions of the national agreement; and that, if he was, the St. Paul Baseball Club had no legal right to sell his services to the St. Louis club without his consent, yet, if he refuses to serve the St. Louis club, the defendants, unless restrained therefrom by this court, will blacklist him and prevent him from contracting as a player with any other baseball club in the United States, and will cause a loss to him in the sum of not less than $4,000 per year.

It would seem, from the above brief summary of the material facts, that the relation of Kelly to the club was not that of a mere player, within the meaning of the reservation provisions of the national agreement; but the national commission, in its interpretation of the national agreement, has held otherwise, and it is not necessary for the purpose of the present application to review its action.

Assuming, then, that he was a player within the meaning of the reservation provisions of the national agreement, notwithstanding his employment as acting president and general manager of the St. Paul Baseball Club, had the St. Paul Baseball Club a legal right to sell his services to the St. Louis club without his consent? He was not a party to the national agreement, nor did he ever contract with the St. Paul Baseball Club with reference to, or in contemplation of, it. He never signed the player's contract required by the national agreement, and the only written contract signed by him was entered into nearly two years before the national agreement was made and the national commission created, and the verbal contract or arrangement of November 19, 1904, had no relation to his employment as a player. All his service as a player was performed under the contract of 1901, or, if not we are wholly unadvised of any new contract or any modification of the old one, save an increase of salary from time to time. See Lennon's affidavit.

There is no evidence that the claim was made that the adoption of the national agreement in any way operated to change the relation of the parties under the old contract until Kelly was sold to the St. Louis club. Kelly would not be bound by the provisions of the national agreement unless he was a party to it, or contracted with reference to it. He did nothing in the course of his employment in recognition of any right to reserve or sell him under the national agreement. The reservation provisions of the national agreement can only become a part of a player's contract by express stipulation or necessary implication; but Kelly never entered into any contract, express or implied, under the national agreement. His continued service under the contract of 1901, after the adoption of the national agreement, permitted by the St. Paul Baseball Club, may have been violative of that agreement on the part of the St. Paul Baseball Club, but not on the part of Kelly.

The consequences of his refusal to play for the St. Louis club are plainly indicated by article 6, § 2, of the national agreement, above quoted.

An injunction as prayed will be allowed pending the final hearing